**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MCLP Asset Company, Inc., Plaintiff, v. Stewart Title Guaranty Company, Defendant. | **Civil No. 21-1318(GMM)** |

**OPINION AND ORDER**

Before the Court are MCLP Asset Company, Inc.'s (hereinafter, "Plaintiff" or "MCLP") *Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof* ("Motion for Partial Summary Judgment") and Stewart Title Guaranty Company's (hereinafter, "Defendant" or "Stewart") *Motion for Summary Judgment and Memorandum of Law in Support Thereof* ("Motion for Summary Judgment"). (Docket Nos. 48; 50). For the following reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiff's Motion for Partial Summary Judgment and **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 12, 2005, Jorge Luis Azize Ortiz ("Azize") acquired a property ("Property") through Purchase-Sale Deed number 1,564 ("Purchase-Sale Deed") before Public Notary, Luis A. Archilla

Díaz, Esq., ("Notary Archilla") for $225,000.00. (Docket Nos. 48 at 5; 50 at 4). That same day, Azize executed and delivered a promissory note in the principal sum of $175,000 (the "Mortgage Note") before Notary Archilla. (Docket Nos. 48 at 5-6; 47-2; 50 at 4). The debt evidenced by the Mortgage Note was accompanied by the First Mortgage Deed Number 1,565, dated October 12, 2005 (the "Mortgage Deed") before Notary Archilla. (Docket Nos. 48 at 5-6; 47-3; 50 at 4). On October 12, 2005, Stewart also issued mortgage insurance policy no. M99948472663 insuring the mortgage encumbering the Property subject to the Mortgage Deed. (Docket Nos. 47-6; 48 at 6; 51-6).

On November 3, 2005, the Purchase-Sale Deed and the Mortgage Deed were filed at the Registry of Property of Puerto Rico, Fajardo Section, at entries 1111 and 1112, respectively, of volume 277 of the Book of Daily Entries of the referenced section of the Property Registry ("Filing Entries"). (Docket Nos. 51 at ¶ 17; 63 at 11-12). On December 5, 2006, the Registrar of the Property of Puerto Rico, Fajardo Section I, notified Notary Archilla that there were errors on the deeds, which impaired their recording, and those defects were never corrected. (Docket Nos. 48 at 6; 50 at 4). On February 5, 2007, the uncorrected Filing Entries expired. (Docket No. 50 at 4).

On July 4, 2016, Azize filed for Chapter 11 Bankruptcy at Case No. 16-05338 (MCF) (the "Bankruptcy Case"). (Docket Nos. 47-

12; 48 at 6; 50 at 4; 51-8). On August 4, 2016, Azize's original creditor, Banco Popular de Puerto Rico ("BPPR"), filed a Proof of Claim ("POC") in the Bankruptcy Case claiming a "secured" credit in the amount of $171,004.87 for the mortgage loan. (Docket Nos. 47-10; 50 at 4; 51-9). On November 28, 2016, BPPR sent a claim letter informing Stewart that the Filing Entries had never been recorded at the Property Registry and requesting $175,000 under the Policy. (Docket Nos. 47-9; 50 at 4-5; 51-1). On December 13, 2017, BPPR filed its third amended POC in the Bankruptcy Case in which its claim was classified as "unsecured" in the total amount of $171,004.87. (Docket Nos. 50 at 5; 51-11; 63 at 14). Then, on December 15, 2017, Azize filed a Motion Submitting Amendment and/or Supplement to Debtor's Plan or Reorganization that reclassified the POC as a "general unsecured claim" with an estimated recovery of 4.5%. (Docket Nos. 50 at 5; 51-12; 63 at 15).

On February 6, 2018, Stewart e-mailed BPPR stating that it would attempt to record the mortgage on the Property Registry and/or minimize the Insured's loss but still reserve its right to ultimately deny coverage. (Docket Nos. 50 at 5; 51-13; 63 at 15). On March 8, 2018, Azize's reorganization plan in the Bankruptcy Case was confirmed. (Docket Nos. 47-11; 48 at 6; 50 at 5). Therein, the POC was classified as a "general unsecured claim." (Docket Nos. 47-10; 50 at 5; 51-11; 62 at 15).

On April 17, 2018, the POC that was filed in the Bankruptcy Case by BPPR was transferred to DLJ Mortgage Capital, Inc. ("DLJ"). (Docket Nos. 48 at 6; 50 at 5; 51-15). On the same date, Azize filed an application for a Final Decree informing that payment on the POC was made on April 3, 2018. (Docket Nos. 47 ¶ 16; 48 at 6; 62 ¶ 16). The requested final decree in the Bankruptcy Case was entered on July 12, 2018, effectively discharging Azize's obligations. (Docket Nos. 47-13; 48 at 6; 50 at 5; 51-16).

On July 3, 2020, BPPR e-mailed Stewart on behalf of Legacy Mortgage Asset Trust 2019-GS5 ("Legacy") requesting payment under the Policy and approval to tender the original note to the mortgagor. (Docket No. 50 at 5). Stewart responded on September 10, 2020, stating that if the claim fell under the Policy, Stewart's liability would be limited to the Policy's terms. (Docket Nos. 50 at 5-6; 51 ¶ 31). On March 11, 2021, DLJ's counsel sent a letter to Stewart demanding payment under the Policy. (Docket Nos. 50 at 6; 51 ¶ 33). Stewart responded on May 21, 2021, indicating a willingness to settle the claim for the actual loss suffered by the insured. (Docket Nos. 47-18; 50 at 6; 51 ¶ 34).

On June 8, 2021, the original Complaint in these proceedings was filed. (Docket No. 1). On February 4, 2022, DLJ filed a *Motion for Substitution of Plaintiff and Request for Leave File Amended Complaint*, which the Court granted on February 24, 2022. (Docket Nos. 18; 21). On March 16, 2022, DLJ, on behalf of Legacy, filed

the Amended Complaint. (Docket No. 22). The Amended Complaint alleges, among other things, claims of declaratory judgment, breach of contract, and bad faith denial of insurance coverage. (Id.) On November 2, 2022, DLJ, on behalf of Legacy, filed a *Motion for Substitution of Plaintiff Pursuant to Fed. R. Civ. P. 25* requesting that the Court substitute Legacy for MCLP. (Docket No. 39). The Court granted this request on January 9, 2023. (Docket No. 41).

On September 27, 2023, MCLP filed its *Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof*, specifically requesting that the Court grant it declaratory judgments on whether MCLP is insured under the Policy; whether the Policy covers the claimed events; and whether Stewart breached the terms of the Policy by refusing to pay the claimed amounts. (Docket Nos. 47; 48). MCLP also requests that the Court order Stewart to pay MCLP the unpaid principal indebtedness under Schedule A of the Policy, *i.e.* $175,000. (Id.) On September 29, 2023, Stewart filed its own *Motion for Summary Judgement and Memorandum of Law in Support Thereof* seeking summary dismissal of the Amended Complaint. (Docket Nos. 50; 51). Stewart argued that MCLP does not have a valid claim against Stewart given that Plaintiff lacks evidence demonstrating that it holds the mortgage note; in the alternative, Stewart asserted, MCLP failed to timely cure the defects of the Mortgage Deed, and failed to provide the required

proof of its actual loss to qualify for recovery under the Policy, thereby disqualifying MCLP from having a valid claim against Stewart. (Id.)

## II. LEGAL STANDARD

### A. Fed. R. Civ. P. 56

Federal Rule of Civil Procedure Rule 56 governs motions for summary judgment. *See* Fed. R. Civ. P. 56. "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Rojas-Buscaglia v. Taburno-Vasarhelyi, Civil No. 13-1766 (FAB), 2015 WL 4093208, at *1 (D.P.R. June 26, 2015) (*citing* Fed. R. Civ. P. 56(c)). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial,. . .and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Burke Rozzetti v. Ford Motor Company, 439 F.Supp.3d 13, 18 (D.P.R. 2020) (*quoting* Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).

"The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence." Condado 3 CFL, LLC v. Reyes Trinidad, 312 F.Supp.3d 255, 258 (D.P.R. 2018) (*quoting*

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Cintron v. Hosp. Comunitario El Buen Samaritano, Inc., 597 F.Supp.3d 515, 526–27 (D.P.R. 2022) (*citing* Fed. R. Civ. P. 56(c)). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

In reviewing a summary judgement motion, a Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See* Cintron, 597 F.Supp.3d at 527; Shafmaster v. United States, 707 F.3d. 130, 135 (1st Cir. 2013); Laboy-Salicrup v. P.R. Elec. Power Auth., 244 F.Supp.3d 266, 269 (D.P.R. 2017). However, the Court should not "'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 28 (1st Cir.

2023) (*quoting* Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)).

B. Local Civ. R. 56

Motions for summary judgment are also governed by Local Civ. R. 56. The First Circuit has "repeatedly. . .emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Cabán Hernández, 486 F.3d at 7. Such rules "are designed to function as a means of 'focusing a district court's attention on what is-and what is not-genuinely controverted.'" Id. (*quoting* Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 is an "anti-ferret rule. . .intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." López-Hernández, 64 F.4th at 26 (*quoting* Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).

Under Local Rule 56, the non-moving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). For facts that are denied, a non-movant's "opposing statement shall support each denial or qualification by a record citation. . ." Id. The non-moving party's opposing statement may also contain "a separate

section [of] additional facts, set forth in separate numbered paragraphs and supported by record citation." Id. The moving party may then submit a reply that admits, denies, or qualifies the nonmovant's additional facts through "a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party" that is supported by record citation. Local Civ. R. 56(d).

"Under Local Rule 56, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated. . .when the statements contained in the movant's Statement of Uncontested Facts. . .are not properly controverted." López-Hernández, 64 F.4th at 26; *see also* Ramirez-Rivera v. DeJoy, Civil No. 21-01158 (WGY), 2023 WL 6168223, at *2 (D.P.R. Sept. 22, 2023) ("The First Circuit's repeated admonition on this issue in the last few years, places the Puerto Rico federal bar on clear notice that compliance with Local Rule 56 is a mandate, not a suggestion."). Litigants ignore Local Rule 56(c) at their peril. *See* López-Hernández, 64 F.4th at 26.

C. The Declaratory Judgment Act (28 U.S.C. 2201) and Fed. R. Civ. P. 57

"The merits of a declaratory judgment action may be properly asserted by the parties in a motion for summary judgment." Xynergy Healthcare Cap. II LLC v. Municipality of San Juan, 516 F.Supp.3d 137, 144 (D.P.R. 2021) (*quoting* Allstate Ins. Co. v. Martinez,

Civ. No. 11-574, 2012 WL 1379666, at *4 (D. Conn. Apr. 20, 2012)). "Declaratory judgment claims may properly coexist with breach of contract claims when they provide the plaintiff a form of relief unavailable under the breach of contract claim." Id. (internal citations and quotations omitted).

The purpose of the Declaratory Judgment Act is to enable litigants to clarify their legal rights and obligations prior to acting upon them. *See* Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534-35 (1st Cir. 1995); *see also* 28 U.S.C. 2201 (stating that the Declaratory Judgement Act provides a mechanism for parties to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); Fed. R. Civ. P. 57. The critical question Courts must consider when determining whether to grant a motion for a declaratory judgement is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Club Gallistico de Puerto Rico Inc. v. United States, 414 F.Supp.3d 191, 202–03 (D.P.R. 2019), aff'd sub nom. Hernandez-Gotay v. United States, No. 19-2236, 2021 WL 128466 (1st Cir. Jan. 14, 2021) (*quoting* MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127(2007)).

"[F]ederal courts retain substantial discretion in deciding whether to grant declaratory relief." Ernst & Young, 45 F.3d at 534; *see also* El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992); Gilbane Bldg. Co. v. Universal Fire Sprinkler Co., Civil No. 15-3029 (JAG), 2017 WL 11641460, at *1 (D.P.R. Feb. 14, 2017) ("Under the Declaratory Judgment Act, district courts have sound discretion whether to issue declaratory judgments." (*citing* El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992)). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Universal Ins. Co. v. Off. of Ins. Com'r, Civil No. 12-1639 (JAF), 2012 WL 4894668, at *5 (D.P.R. Oct. 15, 2012), aff'd, 755 F.3d 34 (1st Cir. 2014) (*quoting* Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995)).

## III. UNCONTESTED FACTS

The Court examined Defendant's *Statement of Uncontested Material Facts.* (Docket No. 51). The Court also examined Plaintiff's *Statement of Undisputed Material Facts in Support of Motion for Summary Judgment* (Docket No. 47) as well as Plaintiff's *Response to Defendants' Proposed Material Facts, and Statement of Additional Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment* (Docket No. 63), in tandem with the

documents cited and attached thereto, in accordance with Local Rule 56(e). *See* Rodriguez-Burgos v. Arcos Dorados Puerto Rico, LLC, Civil No. 19-2089 (SCC), 2023 WL 2693788, at *2 (D.P.R. Mar. 28, 2023).

Accordingly, the Court makes the following findings of fact:

1. BPPR is a corporation organized under the laws of the Commonwealth of Puerto Rico with its principal place of business located at the Popular Center Building, 268 Ponce de Leon Ave., San Juan, Puerto Rico, 00918. (Docket Nos. 51 ¶ 1; 63 ¶ 1).

2. Legacy is a statutory trust organized under Delaware law with its principal place of business located in Wheaton, IL. (Docket Nos. 51 ¶ 2; 63 ¶ 2).

3. MCLP is a corporation organized under Delaware law with its principal place of business located at 200 West Street, New York, NY 10282. (Docket Nos. 47 ¶ 1; 47-5; 51 ¶ 4; 62 ¶ 1; 63 ¶ 4).

4. DLJ is a corporation organized under Delaware law with its principal place of business located at 11 Madison Ave, 4th Floor New York, NY 10010-3629. (Docket Nos. 51 ¶ 3; 63 ¶ 3).

5. Stewart is an insurance company organized under the Laws of Texas with its principal place of business located in Houston Texas. (Docket Nos. 47 ¶ 2; 51 ¶ 5; 62 ¶ 2; 63 ¶ 5).

6. On October 12, 2005, Azize purchased the Property located at Costa Luquillo Cond., Apartment 109, Luquillo, Puerto Rico through Purchase-Sale Deed number 1,564 before Notary Archilla for $225,000.00. (Docket Nos. 47 ¶ 3; 51 ¶ 6; 62 ¶ 3; 63 ¶ 6).

7. The Property is recorded as Plot No. 4375 page 32 of Volume 82 of Luquillo Registry of Property of Puerto Rico, Fajardo Section. (Docket Nos. 47 ¶ 4; 62 ¶ 4).

8. On October 12, 2005, Azize executed and delivered a promissory note in the principal amount of $175,000 ("the Mortgage Note") for the purchase of the property. (Docket Nos. 47 ¶ 5; 51 ¶ 7; 62 ¶ 5; 63 ¶ 7).

9. The debt evidenced by the Mortgage Note was accompanied by the First Mortgage Deed Number 1,565 dated October 12, 2005 (the "Mortgage Deed") before Notary Archilla. (Docket Nos. 47 ¶ 6; 51 ¶¶ 6-7; 62 ¶ 6; 63 ¶ 7).

10. On October 12, 2005, Stewart issued mortgage insurance policy no. M99948472663 ("Policy") insuring a first mortgage encumbering the Property subject to the Mortgage Deed. (Docket Nos. 47 ¶ 7, 51 ¶ 8; 62 ¶ 7; 63 ¶ 8).

11. The Policy provides:

    SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, STEWART TITLE GUARANTY COMPANY, a Texas corporation, herein called the Company, insures as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

    1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

    2. Any defect in or lien or encumbrance on the title;

    3. Unmarketability of the title;

    4. Lack of a right of access to and from the land;

    5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;

6. The priority of any lien or encumbrance over the lien of the insured mortgage;

7. Lack of priority of the lien of the insured mortgage over the statutory lien for services, labor or material:
   a. arising from an improvement or work related to the land which is contained for or commenced prior to the Date of Policy; or

   b. arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;

8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs; attorney's fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

In witness whereof, Stewart Title Guaranty Company has caused this policy

> to be signed and sealed by its duly authorized officers as of Date of Policy shown in Schedule A.
>
> (Docket Nos. 47-6 at 1; 51-6 at 1).

12. The Policy defines insured as "the insured named in Schedule A," and as the "owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness. . ." (Docket Nos. 47-6 at 2; 51-6 at 2).

13. The Policy defines insured claimant as "an insured claiming loss or damage." (Docket Nos. 47-6 at 2; 51-6 at 2).

14. The Policy defines land as: "the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term 'land' does not include any property beyond the lines of the area described to or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy." (Docket Nos. 47-6 at 2; 51-6 at 2).

15. The Policy defines mortgage as: "mortgage, deed of trust, trust deed or other security instrument." (Docket Nos. 47-6 at 2; 51-6 at 2).

16. Section 2 of the Policy defines the amount of insurance as:

    2(c) Amount of Insurance: The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

    (i) The Amount of Insurance stated in Schedule A;

    (ii) The amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon,

expenses of foreclosure, amounts advanced pursuant to the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) The amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

(Docket Nos. 47-6 at 2; 51-6 at 2).

17. Section 3 of the *Exclusions from Coverage* section of the Policy excludes the following matters from coverage by the policy:

1. Defects, liens, encumbrances, adverse claims or other matters:

a. Created, suffered, assumed or agreed to by the insured claimant;

b. Not known to the Company, not recorded in the public records at Date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

c. Resulting in no loss or damage to the insured claimant; attaching or created

subsequent Date of Policy (except to the extent that this policy insures the priority of the lien of the mortgage over any statutory lien for services, labor or material); or

d. Resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

(Docket Nos. 47-6 at 2; 51-6 at 2).

18. Section 3 of the Policy's *Conditions and Stipulations* regarding the Notice of Claim to be given by the Insured Claimant states:

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim or title which is adverse to the title of which the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest of the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

(Docket Nos. 47-6 at 2; 51-6 at 2).

19. Section 4(d) of the Policy that describes the *Conditions and Stipulations* concerning the Duty of the Insured Claimant to Cooperate states:

In all cases where this policy permits or requires the Company to prosecute or provide for the defense

of any action or proceeding, the insured shall secure to the Company the right to prosecutor provide defense in the action or proceedings, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(Docket Nos. 47-6 at 3; 51-6 at 3).

20. Sections 7 of the Policy states:

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of
(i) The Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c)of these Conditions and Stipulations;
(ii) The amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) The difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy. . .

(Docket Nos. 47-6 at 3; 51-6 at 3).

21. Section 5 of the Policy's *Conditions and Stipulations* entitled Proof of Loss or Damages, states:

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

(Docket Nos. 47-6 at 3; 51-6 at 3; 62 at 14-15).

22. Section 7 of the Policy's *Conditions and Stipulations* entitled Determination and Extent of Liability, states:

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by reason of matters insured against by this policy and only to the extent herein described.

(Docket Nos. 47-6 at 3; 51-6 at 3; 62 at 15).

23. Sections 14(a-b) of the Policy's *Conditions and Stipulations* regarding the Liability Limited to this Policy; Policy Entire Contract states:

    (a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

    (b) Any claim of loss or damage, whether or not based on negligence, and which rises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

    (Docket Nos. 47-6 at 4; 51-6 at 4; 62 at 15).

24. As per Schedule A of the Policy the amount of insurance is $175,000.00. (Docket Nos. 47-6 at 5; 51-6 at 5).

25. On November 3, 2005, the Purchase and Sale Deed and the Mortgage Deed were filed at the Registry of Property of Puerto Rico, Fajardo Section, at entries 1111 and 1112, respectively of volume 277 of the Book of Daily Entries of the referenced section of the Property Registry ("Filing Entries"). (Docket Nos. 51 ¶ 17; 63 ¶ 17).

26. On December 5, 2006, the Property Registrar of Puerto Rico, Fajardo Section 1 notified Notary Archilla, who authorized the Purchase-Sale Deed and the Mortgage Deed, of certain errors in said deeds. (Docket Nos. 47 ¶ 8; 51 ¶ 18; 62 ¶ 8; 63 ¶ 18).

27. On February 5, 2007, the Filing Entries lapsed without ever being corrected. (Docket Nos. 51 ¶ 19; 63 ¶ 19).

28. On July 4, 2016 Azize filed Chapter 11 bankruptcy Case No. 16-05338. (Docket Nos. 51 ¶ 20; 51-8; 62 ¶ 12; 63 ¶ 20).

29. On August 4, 2016, BPPR, the holder of the Mortgage Note at this point in time, filed POC Number 10-1,

claiming a secured credit in the amount of $171,004.87. (Docket Nos. 47-10; 51-9).

30. On November 28, 2016, BPPR submitted a claim letter to Stewart requesting indemnity and payment of $170,085.68 and noticing that the Filing Entries lapsed without the Purchase and Sale Deed or the Mortgage Deed being reported in the Property Registry. The letter referenced "certain error in the vesting [Purchase and Sale] deed and the mortgage deed" and reserved the right to claim losses in excess of the coverage amount for unreasonable delay in Stewart's payment of the claim. (Docket Nos. 47-9; 51-1).

31. Stewart sent a letter to BPPR on a December 7, 2016, noting receipt of BPPR's Claim Letter and requesting additional information regarding BPPR's claim. (Docket Nos. 47-15; 51-10; 62 ¶ 20).

32. On December 13, 2017, BPPR amended its POC and reclassified its claim as an "unsecured claim" in the amount of $171,004.87. (Docket Nos. 47-10; 50 at 5; 51-11; 62 at 15).

33. On December 15, 2017, Azize filed a Motion Submitting Amendment and/or Supplement to Debtor's Plan of Reorganization, classifying BPPR's Claim No. 10-3 as a general unsecured claim with an estimated chance of recovery of 4.5%. (Docket Nos. 51-12; 62 at 16; 63 ¶ 25).

34. In Stewart's February 6, 2018 response to BPPR's Claim letter, Stewart stated that it would attempt to record the mortgage on the Property Registry and/or minimize the Insured's loss. Moreover, Stewart stated that since the investigation of the matter was ongoing, Stewart reserved the right to deny the coverage at a later date. (Docket Nos. 51-13; 63 ¶ 26).

35. On March 8, 2018, the Bankruptcy Court confirmed Azize's Reorganization Plan which treated the referred credit claimed in POC No. 10-3 as a "general unsecured claim." (Docket Nos. 47 ¶ 14; 62 ¶ 14).

36. On April 17, 2018, BPPR filed a transfer of Claim other than for Security, transferring POC No. 10-3 to DLJ (Docket Nos. 47 ¶ 9; 51-15).
37. On April 17, 2018, Azize filed an *Application for Final Decree* informing that a payment on POC No. 10 was made on April 3, 2018. (Docket Nos. 47-13; 62 ¶ 16).

38. The Bankruptcy Court entered a Final Decree on July 12, 2018. (Docket Nos. 47 ¶ 17; 51-16; 62 ¶ 17).

39. In the *Application for Final Decree* in Azize's Bankruptcy case, BPPR's payout for the unsecured claim for $171,004.87 under the Mortgage was only $8,196.48. (Docket No. 47-13 at 13).

40. On June 24, 2019, Azize sold the Property free and clear of liens to a third party for $179,000.00, through Purchase-Sale Deed number 13, before Notary Public Héctor A. Aldarondo Rodríguez, Esq. (Docket Nos. 47 ¶ 18; 47-14; 62 ¶ 18).

41. On July 3, 2020, Legacy emailed Stewart stating that it was the new holder of the Note and requesting payment under the Policy and approval to handover the original Mortgage Note to Azize. (Docket Nos. 47 ¶ 21; 47-16; 51-17; 62 ¶ 21).

42. In a September 10, 2020 letter to Legacy, Stewart acknowledged receipt of the claim and stated that "[w]ithout conceding that coverage for the claimed loss is a matter within the scope of the Policy, we note that liability, if found, is limited pursuant to the terms of the Policy to the reimbursement of actual loss, with the maximum liability capped at the amount of insurance committed." (Docket Nos. 47-17; 51-18).

43. Stewart alleged that under its interpretation of the Policy, the note holder's "actual loss" was the amount it paid to purchase the insured mortgage. (Docket Nos. 47-17; 51-18).

44. In a March 11, 2021 letter, DLJ requested that Stewart provide payment under the Policy based on evidence of the mortgage loan pay-off statement and

evidence of the price paid for the property by a third-party. (Docket Nos. 51-19; 63 ¶ 33).

45. On May 21, 2021, Stewart replied to DLJ stating that it had previously informed Legacy about a willingness to settle the claim for the actual loss suffered by Legacy as based on the Mortgage Property's sale by Borrower as part of the Chapter 11 Bankruptcy proceedings and that the Insured Mortgage cannot be recorded on the Property Registry. (Docket Nos. 51-20; 63 ¶ 34).

46. On July 8, 2021, DLJ filed the instant complaint as the alleged holder of the Note. (Docket No. 1).

47. On February 4, 2022, DLJ filed a Motion for Substitution of Plaintiff and Request for Leave to file Amended Complaint as the new holder of the Note. The Court granted the Motion on February 24, 2022. (Docket Nos. 18; 21).

48. On November 2,2022, MCLP filed a Motion for Substitution of Plaintiff as the current holder of the Note. The Court granted that Motion on January 9, 2023. (Docket Nos. 39; 41; 62 ¶ 10).

## IV. DISCUSSION

Puerto Rico insurance law applies to this diversity action. *See* AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015); Joglor, LLC v. First Am. Title Ins. Co., 261 F.Supp.3d 224, 230 (D.P.R. 2016). Parties advance various arguments to support their respective requests for summary judgment. The Court will address each of these in turn.

### A. Breach of Contract

MCLP asks the Court to find "that Stewart Title committed a breach of the Policy agreement by refusing to pay the claimed amounts." (Docket No. 48 at 15). Specifically, MCLP contends that

Stewart has violated the terms of the Policy in refusing to pay MCLP "$175,000.00 pursuant to Section 2(c)(i) and Section 7(a)(i) of the Policy."[1] (Id. at 13). Moreover, it avers that Stewart's alleged breach of the Policy also constitute violations of Puerto Rico Insurance Code, P.R. Laws Ann. tit. 26, § 101 et seq., and the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 2991. et seq. (Docket No. 22 at 6). In its response, Stewart maintains that it did not breach the terms of the Policy given that MCLP lacked an insurable interest; the Bankruptcy confirmation Plan supplanted any legal obligations established under the Policy; and MCLP did not suffer an actual loss entitling it to payment under the Policy.

To assert a claim for breach of contract, a party must sufficiently demonstrate that there had been: (1) a valid contract; (2) a breach of that contract; and (3) damages resulting from that breach. *See* Rishell v. Med. Card Sys., Inc., 925 F.Supp.2d 211, 216 (D.P.R. 2013) (*citing* First Med. Health Plan, Inc. v. Caremark

---

[1] MCLP alleges that Stewart also breached the terms of the contract through "negligent misrepresentation" and or failure to timely and fairly engage in coverage negotiations under the Policy. (Docket No. 22 at 6). The Court rejects both arguments. Plaintiffs failed to cite any case law on this point, and it is unclear to the Court how the claim of negligent misrepresentation supports their claim of breach of contract. Though the Court has recognized claims for negligent misrepresentation arising under the Puerto Rico Civil Code (*see* MMB Dev. Grp., Ltd. v. Westernbank Puerto Rico, 762 F.Supp.2d 356 (D.P.R. 2010)), it has also held that claims for negligent misrepresentation "do not relate to the interpretation and performance of a contract and therefore do not 'arise under' the [contract]." Carro Rivera v. Parade of Toys, Inc., 950 F.Supp. 449, 453 (D.P.R. 1996). Moreover, the record clearly establishes that Stewart has consistently sent timely responses to MCLP and its predecessors' coverage requests indicating that they were not negligent in their management of the insureds' claims. This matter is discussed more thoroughly in Section IV.C. of this Order.

PCS Caribbean, Inc., 681 F.Supp.2d 111, 116 (D.P.R.2010)). The Court considers these requisite factors, along with each of the parties' arguments in determining whether to grant MCLP's request for declaratory judgment on its breach of contract claim and Stewart's request that the Court grant it summary judgment finding that it did not breach the terms of the Policy.

1. Does MCLP have an insurable interest in Stewart's Mortgage Insurance Policy?

According to Stewart, "MCLP lacks an insurable interest in [the] property. . .[and] to the extent that MCLP cannot prove that it is the holder in due course of the mortgage note, it cannot claim to have rights over the mortgage, and, consequently, it necessarily lacks an insurable interest with respect to the Policy." (Docket No. 50 at 2). Stewart emphasizes that the Note, originally issued to Doral Bank was endorsed first to the Federal Home Loan Bank of New York and subsequently, to the FDIC. Stewart argues that no exhibit evidences an endorsement to DLJ, Legacy, or MCLP and thus contends that MCLP failed to demonstrate that it possesses the Mortgage Note and the Note's derivative insurable interest.

Conversely, MCLP contends that "during the course of the litigation of the case of caption, the Note was endorsed in blank and transferred in favor [of] MCLP." (Docket No. 64 at 4). MCLP argues that under Puerto Rico law, possession of the Note gives it

title to the Mortgage thus creating an insurable interest for MCLP in the insurance policy issued by Stewart. (*See* id. at 3). Moreover, MCLP highlights that the Court granted, and Stewart did not object to, MCLP's motion for substitution of Plaintiff. (Docket Nos. 39; 41).

The party claiming to be insured bears the burden of proving that its interests fall within the scope of the insurance policy. *See* El Fenix de Puerto Rico v. Serrano Gutierrez, 786 F.Supp. 1065, 1069 (D.P.R. 1991). As such, MCLP is tasked with demonstrating that it possesses the requisite insurable interest with respect to the Mortgage that would entitle it to seek recovery under the policy issued by Stewart.

Under Puerto Rico law, the following parties have the authority to enforce an instrument like a Mortgage Note:

> (1) The holder of the instrument, (2) a non-holder in possession of the instrument who has the rights of a holder, or (3) a person not in possession of the instrument who is entitled to enforce the instrument. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

P.R. Laws Ann. tit. 19, § 601. Moreover, "[u]nder Puerto Rico law, when a mortgage is used to guarantee a negotiable instrument, or transferable titles by endorsement or to the bearer, the mortgage rights will transfer with the instrument. . ." DLJ Mortg. Capital, Inc. v. Vargas, Civil No. 16-2823 (JAG), 2018 U.S. Dist. LEXIS

149523, at *7-8 (D.P.R. Aug. 30, 2018) (*quoting* P.R. Laws Ann. tit. 30, § 6118) (emphasis added).

MCLP submitted two documents to establish ownership over the Mortgage Note: (1) the Mortgage Note itself; and (2) a sworn statement by Patrick Pittman ("Pittman"), a Document Control Officer for Select Portfolio Servicing, Inc. (Docket Nos. 47-2; 47-1 ¶¶ 11-13). Pittman attested under penalty of perjury that

> MCLP ASSET COMPANY, INC., acquired the Mortgage Note from Legacy, which was endorsed in blank. The Loan was transferred to MCLP ASSET COMPANY, INC. ("MCLP") by virtue of said endorsement in blank. . .Therefore, MCLP is the current holder of the note and party in interest over the claims object of the Amended Complaint of caption.

(Docket No. 47-1 ¶¶ 11-13).

In analogous cases, documents similar to those filed by MCLP, in tandem with an endorsement or an allonge naming the party whose ownership was being challenged, were sufficient to establish possession. *See* Condado 3 CFL, LLC, 312 F.Supp.3d at 260 (concluding that an original mortgage note affixed with an assignment to Banco Popular and a subsequent allonge to Plaintiff along with a statement under penalty of perjury that Plaintiff was the holder of the note by endorsement was sufficient to establish possession over the note in question); Roosevelt Cayman Asset Co. v. Robles, Civil No. 15-1308 (MEL), 2017 WL 1274002, at *3-4 (D.P.R. Mar. 31, 2017) (finding that a Plaintiff had established ownership over a mortgage note through the submission of a debt

collector's declaration under penalty of perjury that Plaintiff held the note, and the mortgage note itself with an allonge transferring the mortgage note to Plaintiff).

The Court finds that the only evidence submitted to support that MCLP endorsed the Mortgage Note in Blank was Pittman's declaration. The Puerto Rico Commercial Transactions Law defines a blank endorsement as one that is not a "special indorsement." P.R. Laws Ann. tit. 19, § 555(a). The Act defines a "special indorsement" as one "made by the holder of an instrument, whether payable to an identified person or payable to bearer, and the indorsement identifies a person to whom it makes the instrument payable. . ." Id. at (b) (emphasis added). The Note and the affixed allonge submitted by MCLP both identify specific parties to receive payment under the Note, namely Doral Bank and the Federal Deposit Insurance Corporation. (Docket No. 47-2). The Court thus finds that MCLP submitted evidence of two indorsements of the Mortgage Note, both of which were special indorsements to specific parties. As such, the Court finds that MCLP submitted no physical evidence that the Note was ever, as it alleged, endorsed in blank.

Nevertheless, under Puerto Rico Law, MCLP has the authority to enforce the note and thus possesses an insurable interest under the Mortgage Insurance Policy issued by Stewart. Plainly, P.R. Laws Ann. tit. 19, § 601 states that "the holder of the instrument" even one who "is not the owner of the instrument or is in wrongful

possession of the instrument" has the authority to enforce that instrument. In its filings, MCLP submitted the Mortgage Note along with a sworn statement that the Note is in its possession. Thus, even if, as Stewart alleges, MCLP is not the "owner" of the Note, by its very possession, it may nevertheless have the authority to enforce it. Such enforcement capability gives MCLP an insurable interest on the note. As such, the Court **GRANTS** MCLP declaratory judgment on the matter of whether it is insured under the Policy.

2. Does the Bankruptcy Plan or the Policy Control?

Stewart also argues that even if MCLP possesses an insurable interest in the Mortgage through its acquisition of the Promissory Note, MCLP nevertheless lacks a claim, as it is not the holder of a mortgage loan, but rather an unsecured credit. To substantiate this point, Stewart notes that, as part of the Chapter 11 bankruptcy proceeding filed by Azize, on December 13, 2017, BPPR amended its Proof of Claim (POC No. 10-3), reclassifying its claim as "unsecured." Stewart argues that when BPPR filed a Transfer of Claim to DLJ — MCLP's predecessor — on April 17, 2018, it transferred an unsecured claim, and not a mortgage loan. Stewart thus concludes that BPPR could not have assigned to DLJ (and its subsequent transferee MCLP) more rights than what it possessed at the time that the initial transfer of claim occurred. (Docket No. 50 at 3, 11).

Stewart further argues that the Bankruptcy plan constitutes a new contract between the debtor and the creditors, thereby substituting a new claim for the old one under the Policy. (Id. at 12). Stewart supports its argument by citing a series of cases that indicate that a confirmed reorganization plan replaces former legal relationships and obligations between a debtor and its creditors. *See, e.g.,* In re Fundacion Dr. Manuel de la Pila Iglesias, Inc., No. BAP PR 10-041 (BKT), 2011 WL 4592058, at *5 (B.A.P. 1st Cir. Mar. 22, 2011); Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd. (In re Orange Tree Assocs., Ltd.), 961 F.2d 1445, 1448 (9th Cir. 1992); DiBerto v. The Meadows at Marbury, Inc. (In re DiBerto), 171 B.R. 461, 471 (Bankr. D.N.H. 1994).

Conversely, MCLP argues that Stewart erroneously conflates the concept of an "unsecured claim" within the context of a bankruptcy proceeding with an "insured mortgage" within the context of an insurance contract. MCLP contends that Courts "should avoid construction of insurance policies that would 'hoodwink' insurance purchasers and make a nullity of coverage" and would thus "render coverage under the policy meaningless." (Docket No. 64 at 7, 10) (*citing* Lee v. Mercury Ins. Co of Georgia, 808 S.E.2d 116, 125 (Ga. App. 2017)). Furthermore, MCLP avers that "[i]t is axiomatic that the mortgage will exist so long as the debt remains unpaid" (Id. at 11 (*citing* Torres v. Fernandez, 47 P.R. Dec. 845, 848 (P.R. 1934))). As such, MCLP holds that the indebtedness under

a mortgage is insured under the policy, even if it was classified as unsecured in a bankruptcy proceeding.

The Court agrees with MCLP. Plainly, the present case is fundamentally distinct from the case law cited by Stewart. In the instant case, the contract dispute does not involve the bankruptcy debtor—Azize— but rather MCLP, a third-party noteholder. The caselaw is clear: a bankruptcy reorganization plan is a new and binding contract that only changes the legal relationship between the parties to that contract, them being the debtor and his or her creditors. *See* In re Mendez, 246 B.R. 141, 147 (Bankr. D.P.R. 2000) (*citing* 11 U.S.C. § 1141(a)); In re Sergi, 233 B.R. 586 (1st Cir. BAP 1999)) ("A confirmed plan of reorganization is a new and binding contract, amongst debtor and its creditors that is sanctioned by the bankruptcy court."); *see also* In re Scotland Guard Servs., Inc., 179 B.R. 764, 767 (Bankr. D.P.R. 1993)(defining "non-core proceedings" within the context of a bankruptcy proceeding as those involving a cause of action between a debtor and a noncreditor third party); Paul v. Monts, 906 F.2d 1468 (10th Cir. 1990) (A noncreditor third party that agreed to purchase debtor's stock was not bound by debtor's confirmed plan of reorganization, and would not be bound until it acquired property thereunder or unless it agreed to be bound. 11 U.S.C.A. § 1141(a)); In re Moretti, 100 F.3d 967 (10th Cir. 1996) (clarifying that a bankruptcy plan is considered a final judgment only to those bound

by it). As neither BPPR nor MCLP were ever debtors in this matter, their legal relationship with Stewart was not affected by Azize's Bankruptcy Reorganization Plan. The Court thus focuses its contract interpretation to the terms of the Policy.

3. Does the Policy cover MCLP's claim?

The Court next considers whether the facts of MCLP's claim fall within the scope of the Policy's coverage. The interpretation of an insurance policy is a question of law. *See* Nieves v. Intercontinental Life Ins. Co., 964 F. 2d 60, 63 (1st Cir. 1992). Under Puerto Rico contract law, a contract, such as an insurance policy, must be read and interpreted as a whole. P.R. Laws Ann. tit. 31, § 6344.

In the present case, the contents of the Policy are undisputed. As discussed in Section IV. A. 1. of this Order, the Court finds that MCLP, as successor holder of the Mortgage Note, qualifies as a "successor in ownership of the indebtedness" with the authority to enforce the Policy. (Docket Nos. 47-6 at 2; 51-6 at 2). The plain language of Schedule A of the Policy "insures,. . .[a]ny defect in or lien or encumbrance on the title." (Docket No. 47-6 at 1; 51-6 at 1). The uncontested facts demonstrate that Notary Archilla's failure to file corrected deeds with the Property Registry resulted in a defect in title on the Mortgage Deed. Thus, the Court finds that any loss arising from that defect, saving

other restrictions, exclusions, and conditions set forth in the Policy, falls within the scope of the Policy's coverage.

a. Did MCLP incur an "actual loss" under the Policy and are either MCLP or Stewart's valuation of that loss accurate?

Section 7 of the Policy provides that Stewart shall indemnify "against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy." (Docket Nos. 47-6 at 3; 51-6 at 3) (emphasis added). Thus, the Court must next consider the definition of "actual loss" under Schedule A of the Policy to determine whether MCLP's claim constitutes a loss that Stewart is obliged to indemnify.

It is undisputed that the Policy does not define "actual loss." Stewart interprets "actual loss" to mean the amount MCLP paid to purchase the insured mortgage. (Docket No. 50 at 14-15). MCLP, on the other hand, alleges that "actual loss" under the Policy is more appropriately defined as the total payoff balance for the loan in question up to the Policy amount limit. (Docket No. 48 at 2-3).

"[I]nsurance contracts generally are viewed as adhesion contracts under Puerto Rico law, requiring liberal construction in favor of the insured." Lopez & Medina Corp. v. March USA, *INC.*, 667 F.3d 58, 64 (1st Cir. 2012). As such, in interpreting the Policy, the Court must apply a liberal construction in favor of

the insured. Other courts have held that losses insured by title insurance do not become compensable until they become concrete. *See* First Tennessee Bank, Nat. Ass'n v. Laws. Title Ins., Corp., 282 F.R.D. 423, 427 (N.D. Ill. 2012); *see also* Karl v. Commonwealth Land Title Ins. Co., 20 Cal.App.4th 972, 983-84, 24 Cal.Rptr.2d 912 (Cal. App. Ct. 1993)("Since the uninsured lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of loss. . .an anticipated loss cannot be measured until completion of foreclosure because only then is there certainty the lender will not be paid in full"); First Internet Bank of Indiana v. Lawyers Title Ins. Co., No. 1:07-cv-0869, 2009 WL 2092782, at *6 (S. D. Ind. July 13, 2009). These Courts held that only following a foreclosure of a mortgaged property can actual loss be determined.

In U.S v. Appoloni, the First Circuit defined actual loss as "the difference between the original loan amount and the final foreclosure price (less any principal repayments)" and stated that "actual loss usually can be calculated by subtracting the value of the collateral — or, if the lender has foreclosed on and sold the collateral, the amount of the sales price—from the amount of the outstanding balance on the loan." 695 F.3d 44, 67 (1st Cir. 2012). In Falmouth Nat. Bank v. Ticor Title Ins. Co, 920 F.2d 1058 (1st Cir. 1990), the First Circuit defined actual loss, specifically as it pertains to a mortgagee who merely has a security interest in

a property. There the Appellate Court said "it is not the mortgage note that is insured, but rather, what is insured is the loss resulting from a defect in the security." Id. (*citing* Southwest Title Ins. Co. v. Northland Bldg. Corp., 552 S.W.2d 425, 430 (Tex. 1977)).

As a preliminary matter, the Court disagrees with Stewart's argument that "actual loss" under the Policy is equivalent to the amount that MCLP paid to purchase the mortgage note. Reading the Policy as a whole, the Court finds that the loss covered therein is any loss caused by the defect in the title of the Mortgage Deed. The price that MCLP paid to purchase the mortgage note is unrelated to the defect in title covered by the Policy. Moreover, the Court notes that the selling of litigation rights is common practice, particularly for the purpose of recovering under the loss of another. *See, e.g.*, In re San Juan Dupont Plaza Hotel Fire Litig., 789 F.Supp. 1212, 1216 (D.P.R. 1992) ("[R]estrictive provisions in insurance contracts prohibiting assignment after loss are often found contrary to public policy and, consequently, unenforceable"); *see also* 44 Am. Jur. 2d Insurance § 786 ("After a loss has been incurred, the claim to recover insurance proceeds may be effectively assigned by the insured"); Richard L. Epling, Kerry A. Brennan & Brandon Johnson, Intersections of Bankruptcy Law and Insurance Coverage Litigation, 21 NORTON JOURNAL OF BANKRUPTCY LAW AND PRACTICE 112, (2012) ("state law generally does permit the

insured to assign its right to insurance proceeds after a 'loss' has occurred. Bankruptcy courts have recognized that a policyholder may assign its rights to insurance proceeds either pursuant to the policy itself, or in a settlement with an insurer resolving a coverage dispute").

However, the Court also finds fault with MCLP's argument that it is owed the entirety of the unpaid principal indebtedness secured by the policy, to wit $175,000. The record shows that the defect in title led to a reclassification of the Mortgage from secured to unsecured in Azize's Bankruptcy proceedings. Then, in the *Application for Final Decree* in Azize's Bankruptcy case, BPPR's payout for its claim for $171,004.87 under the Mortgage was only $8,196.48 due to the claim's unsecured status. (Docket No. 47-13 at 13). As previously noted, losses insured by title insurance can only be recognized once made concrete following a foreclosure of the mortgage. Had there been no defect in the Mortgage Deed's title causing BPPR's claim to be classified as unsecured, BPPR could only have recouped the requested $171,004.87. The Court thus finds that MCLP's request for the policy limit of $175,000 to be excessive. Accordingly, the Court **DENIES** to grant MCLP's request that the Court order Stewart to pay the amount of $ 175,000 which is the unpaid principal indebtedness under the Policy. Nevertheless, the Court finds that the defect in the Mortgage Title did cause an "actual loss" under the policy. The Court next

considers whether Stewart's liability to cover MCLP's "actual loss" is waived under the other provisions of the Policy.

b. Do any of the Policy's other provisions relieve Stewart of its liability to cover MCLP's claim?

The Court must now analyze whether any of the Policy's exclusions, exceptions, conditions, and stipulations relieve Stewart of its liability to cover MCLP's "actual loss" under the Policy. Stewart alleges that even if MCLP has a claim under the Policy, Stewart is excused from paying the claim due to the applicability of various restrictions and obligations contained in the Policy's other provisions. First, Stewart alleges that BPPR, MCLP's predecessor, violated Section 5 of the policy by failing to timely notify Stewart of the title defects until after the initiation of bankruptcy proceedings and the imposition of an automatic stay. (Docket No. 50 at 12-13). This delay, according to Stewart, prevented it from remedying the recordation errors. (Id.)

In rebuttal, MCLP states that Stewart's own acts estop it from advancing this argument given that in its responses to BPPR, DLJ, Legacy, or MCLP's respective title claims, Stewart never argued that its liability was waived due to the claim's untimeliness. (Docket No. 64 at 14). MCLP further alleges that in the sworn testimony made by Stewart's Senior Vice President, he stated that Stewart had not denied coverage under the Policy but rather was disputing the amount of coverage owed. (Id. at 15).

MCLP thus contends that throughout the proceedings Stewart has assumed the position that the allegedly untimely notification regarding a defect in title by MCLP and its predecessors was not at issue, and that Stewart should accordingly be prevented from arguing lack of coverage for untimely notification. (Id. at 17).

The Court finds MCLP's contention that Stewart should be estopped from advancing the untimeliness argument unconvincing. The record does not demonstrate that Stewart ever conceded the untimeliness defense to MCLP or its predecessors' claims under the Policy. For instance, in Stewart's responses to BPPR's first claim letter, Stewart quoted Section 5 of the Policy emphasizing:

> Paragraph five (5) of the Conditions and Stipulations of the Policy requires the Insured to furnish a proof of loss or damage to Stewart within ninety (90) days after the Insured shall ascertain the facts giving rise to the loss or damage. To date BPPR has not provided a proof of loss as required. In this regard, Stewart requests that BPPR provide a proof of loss. In particular, Stewart requests that BPPR indicate whether the loan secured by the insured mortgage is in default, and, if so, whether foreclosure proceedings have commenced. Stewart reminds BPPR that any prejudice that results to Stewart due to BPPR's failure to provide the required proof of loss could result in the termination of Stewart's obligations under the Policy.

(Docket No. 22-5 at 2). Similarly, Stewart's letter to BPPR dated February 6, 2018, clearly represents that the Parties' dispute is not limited to the amount owed under the Policy. It states: "[b]y expressly reserving our rights to deny coverage under the Policy at some later date, none of our actions in investigating,

defending, prosecuting or settling any claim or suit shall be construed as waiving or creating an estoppel of our rights under the policy." (Docket No. 51-13 at 3).

Having concluded that Stewart is not estopped from raising the untimeliness argument, the Court next considers whether MCLP's claim might be barred by its alleged untimely notification of a loss purportedly covered under the Policy. Section 5 of the Policy provides that:

> "In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, <u>a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage.</u> The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. <u>If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.</u>"

(Docket Nos. 47-6 at 3; 51-6 at 3) (emphasis added).

The Parties agree that the flawed Purchase and Sale, and Mortgage Deeds were filed with the Property Registrar on December 5, 2006. The Parties also do not dispute that the Filing Entries lapsed without being corrected on February 5, 2007. Moreover, the record shows that Azize filed for bankruptcy on July 4, 2016, and

that exactly one month later MCLP's predecessor, BPPR, filed its POC in the bankruptcy case, claiming a secured credit of $171,004.87. The Parties agree that on November 28, 2016, BPPR, submitted a claim letter to Stewart. That letter stated that because the Mortgage Deed was not recorded in the property registry it was unenforceable and moreover the mortgagor, Azize, had filed for bankruptcy which triggered an "automatic stay [which] prevents BPPR from trying to perfect the lien." (Docket Nos. 47-9 at 2; 51-1 at 2). Thus, "[t]his event falls within the scope of coverage of the title insurance policy. Therefore, BPPR hereby files a claim requesting payment of $170,085.68." (Id.).

At issue here, is when the insured claimant "ascertain[ed] the facts giving rise to the loss or damage" and thus started the 90-day period for notification to Stewart of the insured's claim. Schedule A of the Policy states that Stewart insures "against loss or damage. . .incurred by reason of. . .Any defect in or lien or encumbrance on the title." (Docket Nos. 47-6 at 1; 51-6 at 1). Based on the Policy's plain language, the Court finds that the purported loss at issue in this case did not incur on either the date of filing of the flawed Deeds nor the date of expiration for their correction. The Policy's language clearly differentiates "[a]ny defect. . .on the title" and a loss occurring due to that defect. Stewart's contention that the loss occurred at the time of the erroneous filings is accordingly unavailing. The Court finds

that the earliest date upon which the insured might have "ascertain[ed] the facts giving rise to the loss or damage" was on July 4, 2016, when Azize filed for bankruptcy.

Critical to the matter at hand, is whether any untimely notification of loss by BPPR relieves Stewart of its liability under the Policy. Section 5 of the Policy clearly states that Stewart's obligations to the insured regarding matters requiring proof of loss only arise "[i]f the Company (Stewart) is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage." (Docket Nos. 47-6 at 3; 51-6 at 3). Stewart contends that it was prejudiced because it was unable to amend the Filing Entries following Azize's bankruptcy filing and its associated automatic stay. However, any loss in this case could have arisen no sooner than the date of Azize's bankruptcy filing. Thus, even if BPPR's November 28, 2016 proof of loss letter was untimely under Section 5 of the Policy, the Court is unconvinced that Stewart was prejudiced by that untimeliness. The Court accordingly concludes that Stewart is not entitled to withhold coverage for untimeliness pursuant to Section 5 of the Policy.

Stewart also argues MCLP breached its duty to cooperate under the Policy's Conditions and Stipulations. Specifically, Stewart argues that MCLP failed to provide "satisfactory proof" that it possessed rights under the Policy and also failed to disclose the amount it paid for the Mortgage Note which allegedly prevented

Stewart from being able to evaluate MCLP's purported actual loss. (Docket No. 50 at 13-18). Stewart contends that MCLP's alleged breach absolved Stewart of any obligation it may have to cover MCLP's supposed loss. (Id.)

In its opposition, MCLP argues that Stewart is estopped by its own actions from alleging denial of coverage due to lack of cooperation with the investigation. (Docket No. 64 at 17-19). MCLP also contends that Stewart was not prejudiced by MCLP's alleged violation of the duty to cooperate and thus, even if MCLP was uncooperative, Stewart's liability under the policy was not waived. (Id.)

The Court again rejects MCLP's argument that Stewart's own acts estopped it from bringing its duty to cooperate argument. In its communications with MCLP's predecessors, Stewart never conceded that the purported loss was covered under the Policy. Moreover, Stewart's communications with BPPR and its successors repeatedly requested "all documentation associated with this file" to aid Stewart in its investigation as to whether the loss at issue was covered. (Docket No. 51-10). Moreover, in Stewart's February 2018 letter to BPPR, it expressly cited Section 4 of the Policy describing the "Duty of Insured Claimant to Cooperate;" "request[ed] your (BPPR) assistance in this effort and that the Insured provide any material of information requested;" and "expressly reserve[ed] our rights to deny coverage under the Policy

at some later date. . .” (Docket No. 51-13). As such, the Court next considers whether MCLP’s alleged failure to cooperate absolves Stewart of its liability under the Policy.

It is undisputed that the Policy only covers defects in title that result in an actual loss to the insured claimant. Section 4(d) of the Policy states:

> In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to prosecutor provide defense in the action or proceedings, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company’s expense, shall give the Company reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company’s obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(Docket Nos. 47-6 at 3; 51-6 at 3)(emphasis added).

The Court is unconvinced by Stewart’s argument that its obligations under the Policy were terminated due to prejudice arising from MCLP’s alleged violation of its duty to cooperate. Specifically, Stewart contends that it was prejudiced by MCLP’s alleged non-cooperation in failing to provide “information or

documents showing that it is the holder in due course of the note, and of the amount paid for the credit allegedly acquired by MCLP, and/or evidence of proof of loss." (Docket No. 50 at 18).

Firstly, the Court already determined that the price MCLP paid to purchase the note is irrelevant to determining actual loss under the Policy. Thus, MCLP's denial in disclosing that value was not impermissibly uncooperative. Moreover, the Court also concluded that under Puerto Rico law, possession of the Mortgage Note was sufficient to demonstrate that MCLP was a holder in due course. Thus, MCLP neither failed to provide documents showing that it was the holder in due course of the note, nor was it uncooperative in failing to disclose the amount it paid for the note.

Even if the Court were to assume, *arguendo*, that MCLP failed to sufficiently cooperate with the terms of the Policy, Puerto Rico law nevertheless finds that "an insured's breach of a condition precedent requiring cooperation with the insurer does not relieve the latter from liability unless the insurer has suffered material and substantial prejudice therefrom." Municipality of San Juan v. Great Am. Ins. Co., 813 F.2d 520, 521 (1st Cir. 1987). Yet, Stewart has failed to demonstrate how, if at all, it was prejudiced by MCLP's alleged failure to cooperate. *See* Feliciano-Munoz v. Rebarber-Ocasio, Civil No. 16-2719 (MEL), 2021 WL 3835990, at *4 (D.P.R. Aug. 27, 2021) (finding no prejudice

from outstanding breach of contract claim because the party was not "in a different position than that which was originally alleged"); *see also* Allstate Ins. Co. v. Occidental Int'l, Inc., 967 F.Supp.642 (D.P.R. 1997), aff'd, 140 F.3d 1 (1st Cir. 1998) ("Under Puerto Rico law, insurer must show that it was prejudiced by insured's failure to timely notify it of claim."). The Court thus concludes that the Policy's other provisions do not terminate Stewart's liability to cover the "actual loss" caused by the Mortgage Deed's defect in title.

Consequently, the Court **GRANTS** MCLP declaratory judgment finding that the Policy covers the facts giving rise to its claim and concludes that MCLP is entitled to coverage under the Policy. The Court correspondingly **DENIES** Stewart's Motion for Summary Judgment on the Amended Complaint's breach of contract cause of action. However, the Court at this juncture **DENIES** entering a declaratory judgment finding that Stewart has breached the terms of the agreement given that the record demonstrates that Stewart has not yet denied MCLP coverage under the Policy.

B. Unjust Enrichment

In the Amended Complaint, then Plaintiff Legacy alleged that Stewart had been unjustly enriched by withholding the insurance proceeds owed to DLJ. Stewart asserts that the unjust enrichment claim is inapplicable because under Puerto Rico law the unjust enrichment doctrine is inapplicable in contexts where, as here,

there is a legal precept (contract) that excludes the application of the doctrine.

In Puerto Rico, "[u]njust enrichment occurs 'when the laws have not foreseen a situation where a patrimonial shift occurs, which shift cannot be rationally explained by the prevalent body of laws.'" Punta Lima, LLC v. Punta Lima Dev. Co., LLC, 440 F.Supp.3d 130, 150 (D.P.R. 2020) (*citing* Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 780, 122 P.R. Dec. 817, 1988 Juris P.R. No. 147 (1988).

One of the five elements to an unjust enrichment action is the "absence of a legal precept excluding application of enrichment without cause." Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1994 Juris P.R. 2 (1994) (officially translated to English without page numbers). The First Circuit has concluded that the fifth element of an unjust enrichment action is not met when a contract governs a dispute. *See* P.R. Tel. Co., Inc. v. SprintCom, Inc., 662 F.3d 74, 97 (1st Cir. 2011). Thus, it is generally established that "a contract governing the dispute at issue renders the unjust enrichment doctrine inapplicable." Punta Lima, LLC, 440 F.Supp.3d at 151 (*quoting* P.R. Tel. Co., Inc., 662 F.3d at 97). The Court determines that the terms of the Policy govern the dispute at hand, and accordingly the doctrine of unjust enrichment is inapplicable. Thus, the Court **GRANTS** Stewart's Motion for Summary Judgement on

this matter and **DISMISSES** the Amended Complaint's unjust enrichment cause of action.

C. Bad faith

The Amended Complaint alleges that Stewart breached its duty of good faith and fair dealing, primarily due to its "unreasonable delays, inaction and overall bad faith." (Docket No. 22 at 8 ¶ 41). Consequently, Plaintiff's predecessor argued that Stewart "should be held liable for any and all losses in excess of the coverage amount." (Id.) Stewart asserts that the absence of coverage relieves an insurer from bad faith claims. Moreover, Stewart states that even assuming coverage exists, "[t]he exchanges and correspondence between STGC and MCLP defeat any theory that STGC acted in bad faith." (Docket No. 50 at 17).

This Court has previously concluded that the Puerto Rico Supreme Court, applying Puerto Rico law, would likely allow an insured to bring a bad faith action against an insurer. *See* Event Producers v. Tyser & Co., 854 F.Supp.35, 39 (D.P.R. 1993). Under Puerto Rico law, bad faith in the performance of contract obligations is equalized to '*dolo*.' Punta Lima, LLC, 440 F.Supp.3d at 154. *Dolo* "in the performance of a contractual obligation occurs where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation." Casco, Inc. v. John Deere Constr. & Forestry Co., Civil No. 13-1325 (PAD), 2015 WL 4132278, at *2 (D.P.R. July 8, 2015). Plainly, *dolo*

requires malice and or the intention to do harm to another's person or property. *See* Canales-Delgado v. Pan American World Airways, Inc., 12 P.R. Offic. Trans. 411, 425, 112 D.P.R. 329 (1982).

The First Circuit and the Puerto Rico Supreme Court have repeatedly stated that "a party alleging *dolo* could meet its burden only with evidence that is 'solid,' 'clear and convincing,' and 'unquestionable.'" Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 60–61 (1st Cir. 2011) (*citing* Texas Co. (P.R.) Inc. v. Estrada, 50 P.R.R. 709, 713–14, 50 D.P.R. 743 (P.R.1936)). "The Court cannot infer bad faith, collusion, or fraud based on innuendo and speculation alone." García-Navarro v. Hogar La Bella Unión, Inc., Civil No. 17-1271 (JAW), 2022 U.S. Dist. LEXIS 191150, at *88-89 (D.P.R. 2022).

In the case at hand, the record demonstrates that since November 28, 2016, when BPPR submitted its initial claim letter under the Policy, Stewart has been responsive to MCLP and its predecessors' communications. In its responses to BPPR, Legacy, and DLJ's letters Stewart repeatedly indicated that it was investigating the claim and requested information from the parties requesting compensation to aid them in determining its liability. (Docket Nos. 51-10; 51-13; 51-18; 51-20). Moreover, the record does not reflect that MCLP nor its predecessors' claims under the Policy have ever been fully denied. The uncontested facts also

reflect that Stewart has been open to settling the claim. (Docket No. 51-18).

"A claim for dolo under the Puerto Rico Civil Code requires that claimant establish "conscious [and] deliberate purpose of avoiding the normal performance of the obligations" under the Policies." Party Book Hill Park, LLC v. Travelers Prop. Cas. Co. of Am., Civil No. 18-1179 (GMM), 2023 U.S. Dist. LEXIS 168222, *68 (D.P.R. 2023) (*quoting* Marquez v. Torres Campos, 111 D.P.R. 854, 11 P.R. Offic. Trans. 1085, 1098 (1982)). The Court found no evidence of such purposeful avoidance of Stewart's obligations under the Policy. As such, the Court **GRANTS** Stewart's Motion for Summary Judgement on this issue and **DISMISSES** Plaintiff's bad faith claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** in part and **DENIES** in part Plaintiff's Motion for Partial Summary Judgment and **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment. Accordingly, the Court **GRANTS** MCLP declaratory judgment on the finding that it is an insured entity under the Policy and **GRANTS** MCLP declaratory judgment on the finding that the Policy covers the facts of MCLP's claim. The Court also **GRANTS** Stewart summary judgment on MCLP's unjust enrichment and bad faith causes of action and **DISMISSES** those claims.

IT IS SO ORDERED.

In San Juan, Puerto Rico, April 24, 2023.

s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE